# In the United States Court of Federal Claims

No. 20-438 C
Filed Under Seal: March 25, 2022
Reissued: April 20, 2022[*]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| | \* |
| **LESLIE BOYER,** | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| **THE UNITED STATES,** | \* |
| | \* |
| Defendant. | \* |
| | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Jon C. Goldfarb*, Wiggins Childs Pantazis Fisher & Goldfarb, LLC, of Birmingham, AL, for Plaintiff.

*Kara M. Westercamp*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for Defendant.

## OPINION AND ORDER

**SOMERS**, Judge.

This case is brought by Plaintiff Leslie Boyer, a female clinical pharmacist at the Veterans Affairs Medical Center of Birmingham, Alabama ("BVAMC"), who alleges gender discrimination in violation of the Equal Pay Act ("EPA"). Plaintiff's claim arises out of her discovery, three years after her hiring, that a male coworker in the same position ("Male Comparator"), who Plaintiff alleges has less experience than her, was hired after her with a higher starting pay rate. The justification for the pay differential forms the crux of this dispute.

Plaintiff, in moving for summary judgment, asserts that BVAMC willfully violated the EPA by relying on prior salary alone in determining pay rates. The government, in cross-moving for summary judgment, concedes Plaintiff has established a prima facie case under the EPA; however, it asserts as an affirmative defense the use of a "factor other than sex" in determining

---

[*] Pursuant to the protective order entered in this case, this opinion was filed initially under seal. No redactions were proposed; and the Court made minor typographical and stylistic corrections.

Plaintiff's and Male Comparator's pay rates, citing the statutory and regulatory authorities that govern federal pay determinations.[1]  For the reasons that follow, the Court denies Plaintiff's motion for summary judgment and grants the government's cross-motion.

## BACKGROUND AND PROCEDURAL HISTORY

As is evident from the briefs in this case, what constitutes the factual record in this case appears to be uncontested.[2]  The parties, however, put genuine issues of material fact in dispute by the markedly different conclusions they draw from the evidence in the record.  An overview of the relevant hiring process, Plaintiff's and Male Comparator's appointments, and the proceedings to date is necessary to understand Plaintiff's claim.

### A.  Hiring Process at BVAMC

Generally, new hires (or "appointments") in the federal government are made at the minimum rate of pay (or "step") for the appropriate grade of the individual under the General Schedule ("GS") system.  *See* 5 U.S.C. § 5333.  In order to depart from the minimum step, an agency must justify the step increase it intends to offer the individual.  *Id*.  In pertinent part, 5 U.S.C. § 5333 provides that, pursuant to regulations, federal agencies may appoint an individual above the minimum step "for such considerations as the existing pay or unusually high or unique qualifications of the candidate, or a special need of the Government for his services . . . ."  *Id*.

Although Plaintiff and Male Comparator, as pharmacists, were hired pursuant to 38 U.S.C. § 7401(3) (and not title 5), 5 U.S.C. § 5333 (as is explained in more depth *infra*) is nonetheless relevant to the application of the EPA in this case.  Some, but not all Department of Veterans' Affairs ("VA" or "Department") employees, are hired pursuant to title 5 and, therefore, are directly covered by § 5333.  Moreover, the Veterans Health Administration ("VHA")—a component of the Department—uses specific policies and procedures to make a new appointment and to justify a departure from the minimum step of a grade that track nearly verbatim § 5333's grounds.  VA Handbook 5007/51, Part II, Chapter 3 provides that "[a]uthorized individuals may, after considering an individual's existing pay, higher or unique

---

[1] The Court assumes the government conceded that Plaintiff established a prima facie case because this litigation was originally filed in a district court, which, in addition to lacking jurisdiction over the case, was not bound by Federal Circuit precedent that requires an EPA plaintiff to "establish that the pay differential between the similarly situated employees is 'historically or presently based on sex.'" *Gordon v. United States*, 903 F.3d 1248, 1254 (Fed. Cir. 2018) (quoting *Yant v. United States*, 588 F.3d 1369, 1372 (Fed. Cir. 2009)), *vacated following joint stipulation of voluntary dismissal*, 754 F. App'x 1007 (Fed. Cir. 2019).

[2] To date, the parties have not objected to, or contested the admissibility of, any materials presented in the record or attached in support of their briefs.  Rather, the parties simply draw two different conclusions from the same set of facts presented to the Court.

qualifications, or special needs of VA, appoint [certain employees] . . . at rates of pay above the minimum rate of the [highest applicable rate range for the] appropriate grade." *See* ECF No. 43 at 4 ("Gov.'s Mot. Summ. J.") (citing ECF No. 44 at 18 ("Appx")).[3]  To do so, the VA considers the following "Criteria for Pay Determinations":

> The following factors must be documented and forwarded to the authorizing official for consideration when requesting appointment of an individual at a rate above the minimum rate of the grade:
>
> a.  Recommended grade, step and salary rate;
>
> b.  Reason for requesting an appointment above the minimum rate of the grade.  This may include information on the candidate's existing pay or recent salary history, competing job offer(s), higher or unique qualifications, or special needs of VA . . . .

Appx 19.  Thereafter, "the selecting official is required to 'forward the recommendation for appointment above the minimum rate of the grade to the appropriate professional or similar standards board.'"  Gov.'s Mot. Summ. J. at 5 (quoting Appx 20).  "The board will consider this information when making a formal recommendation regarding the candidate's qualifications, and recommended grade and step upon appointment."  Appx 20.  Such board recommendations "may serve as the justification to support an appointment above the minimum rate of the grade."  *Id*.  Furthermore, "[a] brief narrative . . . should be included which provides pertinent information regarding the basis of the recommendation as it relates to the candidate's existing rate of pay, recent salary history or competing job offer, higher or unique qualifications or special needs of the VA."  *Id*.

The relevant board in the instant case is the Veterans Integrated Service Networks 7 Pharmacy Professional Standards Board ("VISN 7 Board" or "Board"), which has the

---

[3] As a general housekeeping matter, the Court notes that throughout the briefing in this case, the parties direct the Court's attention to what are effectively the same source materials, but which appear at—and are duplicated throughout—numerous points on the docket.  For example, in Plaintiff's motion for summary judgment, she cites an affidavit quote at "ROI 103."  Pl.'s Mot. Summ. J. at 6.  This references a document within a "Record of Investigation" that was filed by the government in the Northern District of Alabama, prior to this case being transferred here.  Plaintiff notes that the quote is also located at "Doc. 6 p. 111."  *Id*. n.1.  The government here, however, cites the same quote in its motion for summary judgment as "Appx201," referring to the more recently filed "Administrative Record" at ECF No. 44 (plus attachments).  Gov.'s Mot. Summ. J. at 17.  This could create a confusing mess of references, double references, and cross-references.  On October 30, 2020, the government filed a four-part appendix to its cross-motion for summary judgment.  ECF No. 44, 44-1, 44-2, 44-3.  As the Appendix contains most, if not all, of the documents referred to by the parties in their cross-motions, the Court will cite to the government's appendix ("Appx") throughout this opinion when drawing upon the factual record, unless a cited document or record does not appear (or is not as readily identifiable) in the Appx.

responsibility "to advance the professional standards of pharmacy by determining eligibility for employment and grade qualifications for GS-14 level positions or lower grades where a local Board cannot be convened." Appx 35. Moreover, the VISN 7 Board "will, where necessary, make recommendations for appointment, reassignment, retention, promotion and special within-grade advancements consistent with the aforementioned grade levels." *Id*. Pursuant to the VISN 7 Board's policy:

> Any request should be submitted to the designated Human Resources Representative at the local Medical Center. The HR Representative or designee will ensure that all of the appropriate documentation, such as the license, application, and where needed, [Official Personnel Folder], are available. The Representative will then forward the request and file to the Chair of the Local Board or the Chair of the VISN Board, who will determine and convene the necessary members to act on the request. The Board's recommendation, along with the supporting documentation, will be returned to the originating HR Office for final approval by the Medical Center Director.

*Id*. In short, the selecting official sends a recommendation for an individual's appointment, grade, and step to the Board, which then "act[s] on the request" and presents its recommendation "for final approval" to the Medical Center Director.

## B. Plaintiff's Appointment and Step Determination

Plaintiff earned her doctorate in pharmacy in 1999. ECF No. 46 at 6 ("Pl.'s Mot. Summ. J."); *see also* Appx 67. She worked as a staff pharmacist at Pay-Less Pharmacy from 1999 to 2000, Rite Aid Pharmacy from 2000 to 2002, Huntsville Hospital from 2002 to 2005, and Walgreens from 2005 to 2007. *Id*. In 2007, Plaintiff accepted a position as a pharmacy manager at Kroger Pharmacy, a position in which she remained part time until her move to BVAMC.[4] Pl.'s Mot. Summ. J. at 6–7. Finally, Plaintiff worked as a staff pharmacist at the State of Alabama-North Alabama Regional Hospital in Decatur, Alabama, from 2011 until shortly before BVAMC hired her in 2015. Appx 67.

In February 2015, Plaintiff applied for a position as a clinical pharmacist with BVAMC. Gov.'s Mot. Summ. J. at 6 (citing Appx 59–66). In her application, Plaintiff listed her salary at

---

[4] There is some ambiguity in the record over whether and when Plaintiff worked full-time at Kroger Pharmacy. For now, the matter is irrelevant to the question before the Court on summary judgment.

North Alabama Regional Hospital as "105,000.00 USD Per Year" and her salary at Kroger Pharmacy as "120,000.00 USD Per Year."  *Id*. at 6–7 (citing Appx 63).[5]

Prior to her start, Plaintiff exchanged a series of emails with Monica Sfakianos, Associate Chief, Pharmacy Service, concerning a range of topics, including an official start date and salary with BVAMC.  Appx 71–73.  On June 9, 2015, Plaintiff emailed Sfakianos stating: "I am currently just filling in for Kroger.  Our census at the hospital is down to six patients and should be down to two later this week, so I am no longer employed by the State of Alabama."  Appx 71.  Plaintiff continued:

> Also, Ramona mentioned that I could send copies of my W-2 forms or payroll stubs from Kroger and the State [of Alabama] and she would pass the information along to the review board that I have worked two jobs the last four years.  Kroger did not pay me a premium rate for the hours I worked.  I have asked around and it is a very conservative rate . . . . I would like to know if this is acceptable with you for her to communicate this salary information to the review board for me.

*Id*.  In reply the same day, Sfakianos said:

> Send [me] anything you can that I can justify meeting salary!!
>
> The GS 12 pay scale ranges from step 1  $96,133 to step 10  $124,980.  They do not base it on years of experience.  It is more based on education, residency, published articles, BCPS, etc… but they do consider salary matching.  Although, I don't think they will let us use the combined salaries to match our salary.  We will surely try!

*Id*.  The next day, Plaintiff responded with:

> Monica, I faxed information confirming my salary and hourly rate from Kroger.  Please let me know you received it.  Does it matter to the board that my current employer is Kroger instead of the State of Alabama?  I really appreciate you

---

[5] It appears that this $120,000 per year salary is actually what Plaintiff would hypothetically have made if one calculates her part time hourly wages as if she was working in this position full time.

getting this information to them and I look very forward to working with you and
the VA!

Appx 72.

On July 7, 2015, Sfakianos sent a memorandum to the Board recommending Plaintiff's
appointment to BVAMC, wherein she justified an upward departure from the minimum pay rate
for the grade for the pharmacist position.  Appx 70.  In relevant part, Sfakianos' memo states:

> 1.  The following candidate, [Plaintiff], has been selected as a Clinical
> Pharmacist, Pharmacy Service, GS-660-12, Birmingham VA Medical Center.
> She has met all the requirements to be considered for initial appointment.  I
> recommend her initial appointment as a GS-12, Step 7, which is above the
> minimum rate of grade (GS-12, Step 1).  This board action is recommended for
> initial appointment and applies to the Licensed Pharmacist Qualifications
> Standards in accordance with the provisions of VA Handbook 5005/55, Part II,
> Appendix G15.

> 2.  BVAMC will benefit greatly from the addition of [Plaintiff] to our staff.  She
> brings a wealth of experience through her fifteen years of pharmacy practice.  She
> has extensive experience with direct patient care in both retail and institutional
> settings.  She also has advanced clinical skills with medication monitoring and
> making medication recommendations based on clinical efficacy while maintain
> [sic] an annual budget.  She most recently has worked directly as a lead
> pharmacist in a mental health institution.  This will be of great benefit in dealing
> with this growing population of our veterans.  She also has experience with and
> coordinated Joint Commission surveys within pharmacy services.

> 3.  The recommendation of a GS-12, Step 7 is requested to secure [this] highly
> qualified candidate.  GS-12, step 7 is recommended to remain competitive and
> meet current documented salary.  In addition, candidate received a very positive
> reference from former employers.  The enclosed board action is submitted for
> review and recommendation. . . .

*Id*.  Two days later, July 9, 2015, the Board provided its recommendation that Plaintiff be
appointed as a clinical pharmacist at GS-12, Step 7.  Appx 69.  In pertinent part, the Board's
recommendation states:

> [Plaintiff] brings over fifteen years of pharmacy practice.  She has extensive
> experience with direct patient care in both retail and institutional settings.  She

also has advanced clinical skills with medication monitoring and making
medication recommendations based on clinical efficacy while maintain [sic] an
annual budget.  She has extensive experience with pharmaceutical needs of
mental health patients which will be a benefit in dealing with this growing
population of our veterans.  She also has experience with and coordinated Joint
Commission surveys within pharmacy services.  Due to [Plaintiff's]
pharmaceutical skills, education and current salary, the board recommends a
GS12 step 7 to secure this highly qualified candidate.

*Id*.  The record suggests that William F. Harper, Acting Medical Center Director, approved the
Board's recommendation on July 10, 2015, Appx 68, and Plaintiff was officially appointed as a
clinical pharmacist on July 12 at GS-12, Step 7 with a basic pay of **$115,364**, Appx 38.

## C.  Male Comparator's Appointment and Step Determination

Approximately six months after Plaintiff's hiring, BVAMC hired Male Comparator as a
clinical pharmacist at GS-12, Step 10 with a basic pay of **$126,223**.  ECF No. 32. at ¶ 5
("Transfer Compl.").  He earned a masters in biological sciences in 2003 from the University of
Alabama in Huntsville, followed by a doctorate in pharmacy in 2006 (seven years after Plaintiff)
from the same institution as Plaintiff.  Gov.'s Mot. Summ. J. at 19 (citing Appx 331).  He
worked as a pharmacy manager at Rite Aid from 2006 to 2012, Kroger from 2012 to 2015, and
Central North Alabama Health Services, Inc., from 2015 until his hiring at BVAMC in January
2016.  Pl.'s Mot. Summ. J. at 7; *see also* Appx 331.

On January 6, 2016, Sfakianos sent a memorandum to the Board recommending Male
Comparator's appointment to BVAMC, wherein—as with Plaintiff—she justified an upward
departure from the minimum pay rate for the position.  Appx 334.  In relevant part, Sfakianos'
memo states:

1.  The following candidate, [Male Comparator], has been selected as a Clinical
Pharmacist, Pharmacy Service, GS-660-12, Birmingham VA Medical Center.  He
has met all the requirements to be considered for initial appointment.  I
recommend his initial appointment as a GS-12, Step 10, which is above the
minimum rate of grade (GS-12, Step 1).  This board action is recommended for
initial appointment and applies to the Licensed Pharmacist Qualifications
Standards in accordance with the provisions of VA Handbook 5005/55, Part II,
Appendix G15.

2.  BVAMC will benefit greatly from the addition of [Male Comparator] to our
staff.  He brings a wealth of experience with many years of pharmacy practice.

He has extensive experience with direct patient care, medication management, patient counseling, formulary management, Joint Commission standards and pharmacy administration.

3.  The recommendation of a GS-12, Step 10 is requested to secure highly qualified candidate.  GS-12, step 10 is recommended to remain competitive and more closely meet current documented salary.  In addition, candidate received a very positive reference from former employers.  The enclosed board action is submitted for review and recommendation. . . .

*Id*.  On January 11, 2016, the Board provided its recommendation that Male Comparator be appointed as a clinical pharmacist at GS-12, Step 10.  Appx 333.  The Board's recommendation states:

1.  BVAMC will benefit greatly from the addition of [Male Comparator] to our staff.  He brings a wealth of experience with many years of pharmacy practice.  He has extensive experience with direct patient care, medication management, patient counseling, formulary management, Joint Commission standards and pharmacy administration.  [Male Comparator's] experience will be valuable in treating veterans in the Huntsville CBOC as a new expanded clinic where a hybrid model will be utilized between dispensing functions and direct patient care.

2.  The recommendation of a GS-12, Step 10 is requested to remain competitive and more closely meet current documented salary of this highly qualified candidate.  In addition, candidate received a very positive reference from former employers.  The enclosed board action is submitted for review and recommendation. . . .

*Id*.  The record suggests that Thomas C. Smith, III, Medical Center Director, approved the Board's recommendation on January 22, 2016.  Appx 332.

### D.  Plaintiff's Discovery of Step Differential

In July 2018, three years after her hiring, Plaintiff learned she was paid at a lower rate than three pharmacists she worked with at BVAMC's Huntsville clinic—one male and two females.[6]  Appx 153, 291.  In a July 24, 2018, email to Angela Craig, the Supervisory Human Resources Staffing Specialist for BVAMC, Plaintiff alleges:

---

[6] The VA's "Investigative Report" for Plaintiff's "EEO Complaint of Discrimination" includes the following computation regarding prior salary:

The past three years I have made $10,000 less per year than all three. I explained to Ms. Sfakianos that my performance the last three years has exceeded the other three pharmacists and Ms. Sfakianos explained that my salary was a difference in the boarding process. She feels that prior salary made a difference for the other pharmacists, but I am concerned that my previous salary was not recommended clearly to [the Board].

Appx 291. Plaintiff's email also states, "I have a higher degree than one pharmacist, more clinical experience and years of experience relative to this career at the VA, and a higher evaluation than the other pharmacists." *Id*. In response to Plaintiff, Craig writes:

The Professional Standards Board (PSB) set the pay for Pharmacists. The service manager send [sic] a recommendation memo to HR. We attach this memorandum with your resume and application and send this to the PSB. It is up to the PSB, which are the subject matter experts, to take into consideration what the manager recommends (grade and step).

Appx 287.

On July 24, 2018, Plaintiff emailed Sfakianos purporting to cite Office of Personnel Management ("OPM") guidance regarding salary and step determinations, which in turn cites as

---

Pay information submitted to the Pharmacy Professional Standards Board by [Plaintiff] and [Male Comparator] shows that the pay stub provided by [Male Comparator] indicates that his previous employer paid him a rate of $62.50 per hour which worked out to yearly calculated rate of $130,000 when multiplied by the number of work hours in a year (2080). The first pay stub provided by [Plaintiff] indicated that she was paid $4,791.80 in a pay period. It also indicated that [Plaintiff] was paid by her previous employer 24 times a year for a yearly calculated rate of $115,003. [Plaintiff] also submitted a paystub that covered May 17, 2015, to May 23, 2015, indicating she had worked 6.75 hours, this page includes a handwritten note that advises this is part-time work, and that HR cannot combine full-time and part-time to equal one full-time VA position. She also submitted a W-2 tax form indicating that she made $15,627.93 in 2014 from the same employer. The W-2 also has a handwritten note indicating it was part-time employment. She also turned in a print out indicating pay from 2011 which also includes a handwritten note stating that it was not used as it was not current.

A document showing special rates for the city of Huntsville, Alabama, where the Huntsville Clinic is situated, shows that for this locality the rate of pay for GS-12 positions are as follows: Step 7 at $115,364, Step 8 at $118,570, Step 9 at $121,775, and Step 10 at $124,980.

Appx 154–155 (internal citations omitted).

"References" 5 U.S.C. § 5333 and 5 C.F.R. § 531.212.[7]  Appx 189–190.  On July 30, 2018,
Sfakianos—in responding to each line of Plaintiff's cited "OPM guidance" in turn—explained
that Plaintiff's "experience was one of the reasons used for justification for boarding at a step 7"
and that Plaintiff's "previous full time salary (stub provided) was used by the Board and HR
when the initial step was recommended."  Appx 185.  Moreover, the "same boarding factors
were used for all pharmacists hired."  Appx 186.  Plaintiff, disagreeing with Sfakianos' statement
regarding her experience, points to the June 9, 2015, email from Sfakianos telling Plaintiff,
"[t]hey do not base [salary] on years of experience."  Appx 184 (original at Appx 71).  Sfakianos
replied:

> I stated . . . that salary is not based on "years" of experience.  Your mental health
> experience was noted [in] your boarding request.
>
> We tried to justify as much as we could.  The [clinical pharmacist] position in the
> Huntsville Annex did not require any mental health experience.  I agree that your
> 4 years working at the State mental health facility was beneficial, as a large
> portion of our population has mental health needs.  That is why it was noted in the
> boarding information.

Appx 183 (emphasis in original).

On August 2, 2018, Plaintiff met with Lorelei Hudson, Assistant Chief Human Resources
Officer for BVAMC, as the "next level" in the grievance process.  Appx 97.  The day after,
Hudson emailed Sfakianos regarding her own review of the boarding process for Plaintiff, Male
Comparator, and Plaintiff's two other clinical pharmacist coworkers (both female)[8] who—like
Male Comparator—were hired at Step 10:

> I explained to [Plaintiff] that I determined the board actions were completed in
> accordance with VA Handbook 5005/55 Part 11, Appendix G15.  I explained that
> based on this information there was no legal/regulatory basis for me to correct her
> salary.  I expressed to [Plaintiff] that salary negotiations should occur when job
> offers are extended and at that time an applicant may decline or accept the job
> offer.

*Id.*

---

[7] Plaintiff begins her email to Sfakianos stating, "Ms. Craig asked for OPM guidance, so I wanted
to send to you also."  Appx 189–190.  It is not clear from where or whom Plaintiff received the "Pay Rate
Determination" information, which references 5 U.S.C. § 5333 and 5 C.F.R. § 531.212.  *Id.*

[8] While Hudson's email only provides the names of the four clinical pharmacists, the VA's
"Investigative Report" demonstrates that the two other comparator clinical pharmacists at the Huntsville
clinic at the time of Plaintiff's grievance were female and boarded at the Step 10 rate.  Appx 121.

### E.  Equal Employment Opportunity Investigation

Unsatisfied with the response she received from BVAMC, Plaintiff consulted with an Equal Employment Opportunity ("EEO") counselor in the VA's Office of Resolution Management ("ORM") on August 3, 2018.  Appx 102, 105–08.  In the counselor's report, Plaintiff's claim is noted as an alleged EPA violation on the bases of race and sex, for which Plaintiff seeks "[p]ay equal to her coworkers at the Step 10 rate."  Appx 106.  It also notes Plaintiff's allegation that "Sfakianos did not accurately account for her past salary, and denied her request for pay increase when evidence was provided."  *Id*.  On August 17th, in response to Plaintiff's consultation with ORM, Renee Smith, Chief of Pharmacy Service, explained:

> The pharmacist application process consists of submitting the applicant's package along with a BVAMC memo with salary recommendation.  In accordance with the requirements set forth in VA Handbook 5005, Appendix G-15 Licensed Pharmacist Qualification Standard, the Pharmacist Professional Standards Board reviews the qualifications and application package.  The memoranda for boarding recommendations for each of the GS-12 pharmacists is submitted as Attachment 1.  In accordance with VA Handbook 5005/86, Part 11, Appendix O, the local facility will board appointments for Pharmacist, GS-660-12 and below.  The Board determines Grade/Step for initial appointments, then the board action is routed to the Medical Center Director for signature.  A firm job offer is extended to the Pharmacist and at that time they may accept or decline the job offer.  Pharmacist salary negotiation occurs 'up front' during the application and boarding process which in the case of Ms. Boyer was July 2015.

Appx 121.  Smith concluded that "[Plaintiff's] race and sex where [sic] not a determining factor in her Step determination," and "pharmacists of both White and female EEO protected category were hired at the Step-10 rate."  *Id*.

Following an unsuccessful mediation, Plaintiff filed a formal EEO complaint on October 23, 2018, alleging wage discrimination "because of my female gender and race."  Appx 102.  She points specifically to Male Comparator as having "an identical job to mine and was hired in at a higher level than me despite the fact that I have more experience and superior qualifications than him."  *Id*.  The record then proceeds with EEO affidavits of Plaintiff, Sfakianos, and other VA officials, the transcripts of which Plaintiff and the government reference throughout their briefs.

The EEO affidavits begin with Plaintiff's testimony.  When asked to identify the officials responsible for her alleged discrimination, Plaintiff replied, "Monica Sfakianos is responsible for boarding me."  Appx 168.  Regarding her salary determination, Plaintiff testified that Sfakianos

"told me that she recommends a certain step and then the rest of the group can either approve that, go along with it, or disapprove it.  So, she recommends the step."  Appx 171.  Later, however, Plaintiff testified, "I think that [Sfakianos] can basically recommend whatever she wants to recommend.  And that the board would approve whatever she recommended."  Appx 174.  Plaintiff continued, "I deserve to be boarded at a step 10 because I perform the same exact duties as the Pharmacists here in Huntsville.  Especially [Male Comparator].  I know his work history and . . . [h]e has only retail pharmacy experience and has less experience by seven years."  *Id*.

Plaintiff also testified that she had explained to Sfakianos about working two jobs— Kroger and the North Alabama Regional Hospital—for the seven years preceding her VA boarding, but Sfakianos "told me that she could not look at my salary from the combination of my past two jobs . . . ."  Appx 175–176.  Plaintiff explained that her hospital employment "had a lower salary there because there were a lot of benefits and perks that no one else offers in Pharmacy."  Appx 176.  For example, Plaintiff "could get off work any time [she] wanted to," "accrued like three days of comp time every month," and "was able to spend – do things with [her] family a lot easier than [she could] at and [sic] other job."  *Id*.  The hospital closed in May 2015, so Plaintiff "asked Kroger if [she] could work full-time for them. . . . So, [she] worked basically full-time several weeks until [she] could get in with the VA."  Appx 176–177.  Plaintiff continued:

> And [Sfakianos] said she could not consider neither a combination of my salaries from the State of Alabama and Kroger and she could not consider my hourly rate from Kroger either because that was considered a premium rate.  Well, I have a problem with that.  That was just another reason I felt it was discrimination.  She did not even want to consider my salaries.  She thought she could give me a lower rate because I guess I was laid off from my dream job.

Appx 177.

Sfakianos also testified.  Asked to describe the normal process for boarding a pharmacist, she explained:

> So when we look at the boarding process to bring [pharmacists] in they may come in between a step one and a step ten.  Everybody is assumed to come in at the minimum which a [sic] step one.  To bring someone up – to justify above the minimum you have to have specific reasons to justify that.  Some examples of those reasons are residency.  There's a one and a two-year residency.  They could get a step for that.  If they have a national certification that could qualify for like two steps.  They have to have very specific qualifications to grant anything above

a step one.  Another way to justify bringing someone in above the step one is their current salary – is to match current salary as best you can.  And so more times than not that is the way we bring people in because it helps us get that employee in and not expect them to take a loss in pay to come to work for us.  And when our recommendation goes to Human Resources, they review our justifications and they have to agree with that before they will sign off on it as the technical representative on the board.

Appx 198–99.  Sfakianos testified that she had participated in the boarding of more than twenty pharmacists, including both Plaintiff and Male Comparator, for whom she "prepared the recommendation memo."  Appx 199.  Asked about her recommendation of each, Sfakianos testified:

Each Pharmacist there was boarded based on their current salary.  We requested that they submit current pay stubs so that we could match.  Otherwise, they would have been brought in [at] much lower steps.  And the salary is the easiest way to justify.  So we did have pay stubs for each of those employees.  We looked – or I looked at the current pay scale at that time versus that person's current salary and most closely matched that salary as I could on the step level from one to ten.

Appx 199–200.  Sfakianos added this was done "[e]very time" she recommended a pharmacist for hire.  Appx 200.  As for Plaintiff's pay stubs, "we used her most current full time pay stub as a comparator to rate her steps for her current one full-time job with the VA."  *Id*.  Sfakianos stated that she "boarded everybody exactly the same without regards to anything special other than their current pay stubs."  Appx 201.

The EEO investigation also obtained testimony from members of the Board.   Lisa Ambrose, a pharmacist who served on the Board for Plaintiff and Male Comparator, described the "normal" boarding process at BVAMC as follows:

[W]e basically have an algorithm that we look at that says you know if this person has had this many years of service then they are rated at this step.  If they have certain publications, then they are rated at certain steps.  So basically it's an algorithm.  And then we also historically have taken into account a person's current or most recent pay stubs from the job in which they're coming from into the VA.  And we try to match as closely as we can to what they're currently being paid.

Appx 210.  Ambrose acknowledged that Plaintiff "may have been offered less than a package than others based on where she was coming from."  Appx 212.  She continued:

I do know that we've had Pharmacists with the same exact credentials if you just looked at their education and experience. But then if you look at their pay stubs of where they're coming form [sic] it can make a huge difference. It can make the difference between a step three and a step ten just based on what they're currently being paid. That's the biggest factor that we always took into consideration. We don't want to short change people who are coming and taking pay cuts to come here. But we don't want to overpay people if they're not already making the higher amount.

*Id*.

Kendra Brookshire, Associate Chief of Pharmacy Service, served as the chairman of the Board for Plaintiff and Male Comparator. Similarly asked about the normal boarding process, Brookshire testified:

So Pharmacists salaries are basically kind of dictated and guided you know through Professional Standards Boards. So we have qual [sic] standards that would determine the grade. And then the steps are generally based on qualifying experience or – generally we would go qualifying experience initially. . . . So we look at their education, training, and qualifying experience and kind of go that route. But at the end of the day pay stubs can basically trump what would be determined by the qualifying experience.

Appx 220. Describing the role of the Board, Brookshire explained:

The board actually you know are making a recommendation but still, it's not the final say. So you know the process would be if I'm a supervisor and I'm submitting a board I would you know evaluate you know the information that I have and their background and their experience. And you know I could submit that and then the board is going to review that and consider it. But even after that, it goes you know through HR and through the VISN for a final determination. So it's really kind of more of a recommendation than an absolute decision.[9]

---

[9] Later, Brookshire reiterated that the Board's recommendation is not necessarily final, stating:

You know neither the supervisor nor really the board has the final say on [recommendations]. You know it is not unusual that a supervisor would make one recommendation and the board go back and evaluate it and is like no we – you know that doesn't really match up. Or the for the board to make a recommendation it [sic] to get to the next level and they say it does not match up. So I think that that's a really important piece. Is that it's a recommendation process.

Appx 221.  Asked again about how salary steps are determined, Brookshire testified:

> So the way that it would normally go is our first scenario is going to kind of be
> you know to look at that relevant experience.  But then if the employee – they can
> choose on the front end to provide you know prior pay stubs.  Or it could be that
> you know they're presented with you know this could be your salary, and they're
> like oh I can't come for that.  You know, and then you know they may be asked to
> provide pay stubs.  But at any rate, if their pay stubs would justify a higher salary
> then really that experience – relevant experience kind of just goes to the wayside.

Appx 222.  Regarding Male Comparator, Brookshire observed that "[h]e also had an MS Degree
in Biological Sciences and a BS Degree.  So those were not required for Pharmacy School, but
that was additional education that he had."  Appx 223.  She also indicated that Huntsville "is a
little more challenging area for recruitment . . . so we would certainly have been inclined to be
willing to match pay to get somebody on board."  Appx 227.

## F.  Subsequent Proceedings and the Instant Case

    Aside from the VA's "Investigative Report" of February 2019, Appx 151–61, the record
is devoid of conclusions or recommendations by ORM concerning Plaintiff's formal EEO
complaint.  The government suggests this is "because less than two months later, in April 2019,
[Plaintiff] filed suit in the United States District Court for the Northern District of Alabama,
alleging a violation of the [Equal Pay Act] . . . ."  Gov.'s Mot. Summ. J. at 19 (citing *Boyer v.
Wilkie*, No. 2:19-CV-00552-JEO (N.D. Ala. Feb. 13, 2020)).  After initially ruling in favor of
Plaintiff on summary judgment, the presiding magistrate judge in that matter determined the
district court lacked subject matter jurisdiction and transferred the case to this Court.  *Boyer v.
Wilkie*, No. 2:19-CV-00552-JEO, 2020 WL 733181, at *1 (N.D. Ala. Feb. 13, 2020) ("Plaintiff
agrees with Defendant that the amount in controversy is greater than $10,000. . . .  As such, the
'Little Tucker Act' applies to her Equal Pay Act claims and the court lacks jurisdiction over the
claim.").  In transferring the case, the magistrate vacated his earlier ruling on summary judgment.
*Id*. at *2.  Plaintiff's complaint here, like its predecessor in the district court, alleges the
government "willfully violated the Equal Pay Act by paying Plaintiff lower wages to a similarly
situated male performing a job of equal skill, responsibility and effort under similar working
conditions."  Transfer Compl. ¶ 18.

    With the dispute now firmly before this Court, the parties have crossed-moved for
summary judgment—largely grounded in conflicting interpretations of the same materials in the

---

Appx 226.

record.[10]  Plaintiff asserts she has undisputedly established a prima facie case under the EPA.
Pl.'s Mot. Summ. J. at 5; *see also id.* at 16–17.  Thus, and as explained more below, the burden
shifts to the government to establish an affirmative defense.  On this point, Plaintiff argues that
the record "contains sworn testimony showing that Defendant relied on prior salary alone in
hiring her at a lower rate of pay than her male comparator," *id*. at 5, and that experience was not
a factor in BVAMC's step determination, *id*. at 25–26.  Plaintiff avers that she "undisputedly had
six more years of pharmacy experience," *id*. at 25, yet BVAMC paid Male Comparator more
"without identifying any ways in which his experience exceeded Plaintiff's," *id*. at 26.
Therefore, according to Plaintiff, the case "turns on whether Defendant's sole reliance on prior
salary constitutes reliance on 'any other factor other than sex' to establish an affirmative defense
under the Equal Pay Act." *Id*. at 6.  Plaintiff urges the Court to "follow the numerous courts that
have held that reliance on prior salary, and especially reliance on prior salary <u>alone</u>, is
insufficient to establish an affirmative defense under [the Equal Pay Act]." *Id*. (emphasis in
original).

In cross-moving, the government admits that Plaintiff "demonstrates a *prima facie* case
under the Equal Pay Act . . . because she was paid less than a certain male coworker at
[BVAMC]." Gov.'s Mot. Summ. J. at 1.  However, according to the government, BVAMC
"possessed legitimate factors other than gender for the plaintiff's starting salary." *Id*.  Citing the
laws governing pay of VHA employees, the government asserts "[t]he plaintiff cannot
demonstrate that the agency considered her gender in establishing her initial base pay . . . ." *Id*.
Rather, "[t]here is no violation of the [Equal Pay Act] because any disparity in pay is due to the
proper application of the *bona fide* gender neutral VHA compensation system covering
[Plaintiff] as well as all other [BVAMC] clinical pharmacists." *Id*. at 2; *see also id*. at 24–32.
The government also argues that Plaintiff fails to indicate any pretext for discrimination, having
"presented *no* evidence that the agency's proffered nondiscriminatory reasons are untrue and that
intentional discrimination is the real reason [Plaintiff] allegedly received less compensation than
her male comparator." *Id*. at 32 (citation omitted) (emphasis in original).  Finally, the
government rejects Plaintiff's allegation of a willful violation of the EPA—which, if found,
extends the relevant statute of limitations—arguing Plaintiff's complaint "lacks any supporting
facts or circumstances" to support a claim of willfulness.  *Id*. at 34–35.

Responsive briefing largely restates the arguments set forth in the cross-motions for
summary judgment.  Plaintiff's response challenges the government's reliance on OPM's
regulatory scheme, arguing that "Defendant made no finding that [Male Comparator's]
qualifications were significantly higher compared to Plaintiff's qualifications; accordingly, the
regulatory language does not authorize reliance on prior salary here." ECF No. 50 at 17 ("Pl.'s
Resp.").  Reiterating segments of Sfakianos' testimony, *see* Appx 201 ("I boarded everybody
exactly the same without regards to anything special other than their current pay stubs"), Plaintiff

---

[10] *See supra* note 3 (regarding the Court's references to "materials in the record").

urges the Court "to follow the majority of Circuits that have considered" the issue of prior pay under the EPA and deny the government's motion, Pl.'s Resp. at 25.  Moreover, "because Defendant has failed to meet its burden of establishing its affirmative defense . . . the Court should not reach the pretext stage of the burden-shifting analysis."  Pl.'s Resp. at 26–27.

The government's response asserts that "statutory and regulatory authority, as well as VHA Handbook 5007, *all* permit an agency to consider existing pay *alone* in setting the initial rate of compensation for employees."  ECF No. 49 at 3 ("Gov.'s Resp.") (emphasis in original).  Even so, "there is actually no dispute of material fact that the board primarily considered prior pay, but also looked to experience and other factors."  *Id*. at 7.  The government also challenges Plaintiff's reliance on EPA case law, given the specific policies and authorities at issue in the instant matter concerning a federal employee.  *Id*. at 12.

The reply briefs offer much the same, with Plaintiff reiterating the government's failure "to come forward with proof that it considered anything other than prior salary alone" and urging the Court to "hold that reliance on prior salary alone is insufficient" as an affirmative defense.  ECF No. 55 at 5 ("Pl.'s Reply") (emphasis in original).  Regarding the regulations at issue, Plaintiff again asserts that "[h]ad [Male Comparator's] experience indeed been greater than the Plaintiff's, and had [BVAMC] made that determination prior to setting his salary, [BVAMC] would not have run afoul of the [Equal Pay Act] . . . ."  *Id*. at 9.  In reply, the government suggests Plaintiff's reading of the regulation incorrectly "conflates the determination of whether a candidate has 'superior qualifications' with the selection of the pay rate," ECF No. 57 at 4 ("Gov.'s Reply"), and it reiterates the "uncontroverted evidence that the agency considered multiple factors—background, experience, and prior pay—and that while prior pay may have been afforded more weight, that was likewise permissible" under the governing law.  *Id*. at 12.

The Court held oral argument on the cross-motions for summary judgment, which are now ripe for consideration.

## DISCUSSION

### A.  Legal Standard

#### 1.  Summary Judgment

Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC") provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the . . . court of the basis for its motion" and must identify the portions of the record

that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former version of Fed. R. Civ. P. 56(c)).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that "might affect the outcome of the suit under the governing law . . . ." *Id*. at 248. For a dispute over a material fact to be genuine, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." RCFC 56(c)(1)(A)–(B).

The judge's function at the summary judgment stage "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial," *Anderson*, 477 U.S. at 249, bearing in mind that "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *id*. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158 (1970)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" thus making summary judgment appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The foregoing also applies in cases, as here, in which the parties have cross-moved for summary judgment. *See Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (Fed. Cir. 2009). "[E]ach motion is evaluated on its own merits and reasonable inferences are resolved against the party whose motion is being considered." *Id*. (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)). "To the extent there is a genuine issue of material fact, both motions must be denied." *Id*. at 969.

## 2.  Equal Pay Act

Enacted in 1963 as an amendment to the Fair Labor Standards Act ("FLSA"), the Equal Pay Act provides:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of

which requires equal skill, effort, and responsibility, and which are performed
under similar working conditions, except where such payment is made pursuant to
(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings
by quantity or quality of production; or (iv) a differential based on any other
factor other than sex . . . .

29 U.S.C. § 206(d)(1).  Through the EPA, Congress sought to correct the "serious and endemic
problem of employment discrimination in private industry—the fact that the wage structure of
'many segments of American industry has been based on an ancient but outmoded belief that a
man, because of his role in society, should be paid more than a woman even though his duties are
the same.'"  *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting S. Rep. No.
176, 88th Cong., 1st Sess., 1 (1963)); *see also Yant v. United States*, 588 F.3d 1369, 1371 (Fed.
Cir. 2009) (stating that Congress acted "to prevent gender-based wage discrimination by
enacting the Equal Pay Act").  The Act is "broadly remedial, and it should be construed and
applied so as to fulfill the underlying purposes which Congress sought to achieve."  *Corning
Glass Works*, 417 U.S. at 208.  In 1974, Congress extended the FLSA's coverage, including the
EPA, to include most federal employees.  Fair Labor Standards Amendments of 1974, Pub. L.
No. 93–259, 88 Stat. 55 (1974); *see also* 29 U.S.C. § 203(d)–(e).

Under the EPA, the burden of establishing a prima facie case of wage discrimination rests
on a plaintiff, who "must show that an employer pays different wages to employees of opposite
sexes 'for equal work on jobs the performance of which requires equal skill, effort, and
responsibility, and which are performed under similar working conditions.'"  *Corning Glass
Works*, 417 U.S. at 195 (referencing 29 U.S.C. § 206(d)(1)).  If a plaintiff is successful in
carrying this burden, "the burden shifts to the employer to show that the differential is justified
under one of the Act's four exceptions."  *Corning Glass Works*, 417 U.S. at 196; *see also
Gordon*, 903 F.3d at 1252 ("Once an employee in an EPA case establishes a prima facie case of
salary discrimination, the burden of persuasion shifts to the employer to prove that the wage
disparity was justified by one of four permissible reasons . . . .").  "The burden on an employer to
establish an affirmative defense is 'a heavy one.'"  *Cooke v. United States*, 85 Fed. Cl. 325, 342
(2008) (quoting *Mansfield v. United States*, 71 Fed. Cl. 687, 693 (2006)), *dismissed*, 352 F.
App'x 429 (Fed. Cir. 2009).  And "[a]n employer must prove that the gender-neutral factor it
identified is indeed *the* factor causing the wage differential in question."  *Behm v. United States*,
68 Fed. Cl. 395, 400 (2005); *see also U.S. Equal Emp. Opportunity Comm'n v. Md. Ins. Admin.*,
879 F.3d 114, 121 (4th Cir. 2018) (holding that employers must prove "not simply that the
employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do
in fact* explain the wage disparity").

Centrally relevant in the instant matter is the EPA's fourth affirmative defense, which
permits employers to use "a differential based on any other factor other than sex . . . ."  29 U.S.C.

§ 206(d)(1)(iv).  The case law varies among the circuits as to the factors other than sex this exception can or cannot sustain, and the Federal Circuit has not yet clearly spoken on the issue.[11] The Second Circuit, for example, requires employers to "bear[] the burden of proving that a bona fide business-related reason exists for using the gender-neutral factor that results in a wage differential in order to establish the factor-other-than-sex defense."  *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526 (2d Cir. 1992).  In the Sixth Circuit, "the 'factor other than sex' defense does not include literally *any* other factor, but a factor that, at a minimum, was adopted for a legitimate business reason."  *U.S. Equal Emp. Opportunity Comm'n v. J.C. Penney Co.*, 843 F.2d 249, 253 (6th Cir. 1988).  The Ninth Circuit, prior to a recent decision that goes a step beyond, opined that employers "cannot use a factor which causes a wage differential between male and female employees absent an acceptable business reason."  *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876 (9th Cir. 1982), *overruled by Rizo v. Yovino*, 887 F.3d 453 (9th Cir. 2018), *and overruled by Rizo v. Yovino*, 950 F.3d 1217 (9th Cir. 2020) (en banc).  Notably, this Court has previously "reject[ed] the gloss placed on the statute by the Second, Sixth, and Ninth Circuits."  *Behm*, 68 Fed. Cl. at 400.  In other circuits, "[t]he factor need not be 'related to the requirements of the particular position in question,' nor must it even be business-related."  *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1462 (7th Cir. 1994); *see also Taylor v. White*, 321 F.3d 710, 719 (8th Cir. 2003) ("[O]ur concern is not related to the wisdom or reasonableness of the asserted defense.").

The disagreement among the circuits is even more apparent regarding a defendant's use of prior or existing salary as the proffered "factor other than sex."  In the Tenth and Eleventh Circuits, prior pay alone cannot justify a wage differential.  *See Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir. 2015) ("[A]n individual's former salary can be considered in determining whether pay disparity is based on a factor other than sex. . . . However, the EPA 'precludes an employer from relying solely upon a prior salary to justify pay disparity.'") (citation omitted); *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995) (Prior salary "cannot solely carry the affirmative defense.").  More nuanced, in the Eighth Circuit, "[w]hen prior salary is asserted as a defense . . . this court carefully examines the record to ensure that an employer does not rely on the prohibited 'market force theory' to justify lower wages for female employees simply because the market might bear such wages."  *Drum v. Leeson Elec. Corp.*, 565 F.3d 1071, 1073 (8th Cir. 2009) (citations omitted).  The Eight Circuit's "concern is related solely to the issue of whether the prior salary is based on a factor other than sex."  *Id.*

---

[11] In *Yant v. United States*, the Federal Circuit affirmed summary judgment regarding an EPA claim in favor of the government because the plaintiffs had "failed to raise a genuine issue of material fact that the pay differential . . . is either historically or presently based on sex."  588 F.3d at 1372.  The circuit also noted that "the difference in pay [in *Corning Glass Works*] was based *solely* on gender.  As such, and consistent with the language of the statute, this was a violation of the [EPA]."  *Id.* at 1373 (emphasis added).  The case did not examine the scope of the EPA's exceptions but, rather, stands for the proposition that "[a]n EPA violation is established when an employee demonstrates past or present discrimination based on sex."  *Id.* at 1374.

In the Fourth and Seventh Circuits, prior salary alone is a permissible "factor other than sex." *See, e.g.*, *Wernsing v. Dep't of Hum. Servs., State of Ill.*, 427 F.3d 466, 468 (7th Cir. 2005) ("Wages at one's prior employer are a 'factor other than sex' and so . . . an employer may use them to set pay consistently with the Act."); *Spencer v. Va. State Univ.*, 919 F.3d 199, 206 (4th Cir. 2019) (denying EPA claim in which "the wage difference at issue resulted from the University setting [claimant's and comparator's] pay at 75% of their previous salaries as administrators"). In stark contrast, the Ninth Circuit recently held that employers, in defending against a prima facie EPA claim, "must demonstrate that any wage differential was in fact justified by job-related factors other than sex. Prior pay, alone or in combination with other factors, cannot serve as a defense." *Rizo*, 950 F.3d at 1231.

The Supreme Court asserted decades ago that the "fourth affirmative defense of the Equal Pay Act . . . was designed differently, to *confine* the application of the Act to wage differentials *attributable to* sex discrimination." *Washington Cty. v. Gunther*, 452 U.S. 161, 170 (1981) (citations omitted) (emphasis added). Moreover, "[u]nder the Equal Pay Act, the courts and administrative agencies are not permitted to 'substitute their judgment for the judgment of the employer . . . who [has] established and applied a bona fide job rating system,' so long as it does not discriminate on the basis of sex." *Id*. at 170–71 (quoting 109 Cong. Rec. 9209 (1963) (statement of Rep. Goodell)).

To summarize, the circuits are split between prior salary alone being an acceptable factor other than sex (Fourth and Seventh), prior salary being an acceptable factor when combined with other factors (Eighth, Tenth, and Eleventh), and prior salary never being an acceptable factor to consider (Ninth).

In addition, if a defendant is able to establish that a factor other than sex was used to justify the salary differential, it is generally accepted that the burden of production shifts to the plaintiff to demonstrate that the proffered justification for the wage differential is pretextual. *See Moorehead v. United States*, 88 Fed. Cl. 614, 624 (2009) ("A plaintiff may counter an affirmative defense under the Equal Pay Act by producing evidence that 'the reasons the employer seeks to advance are actually a pretext for sex discrimination.'") (citing *Aldrich*, 963 F.2d at 526); *Behm*, 68 Fed. Cl. at 400 ("[T]he question of pretext places, at the least, a burden of production on plaintiffs to come forward with evidence that could disprove (or, if you will, prevent the employer from proving) the affirmative defense."). While the Federal Circuit has not explicitly opined on the question of pretext, other circuits have included this "third" step in their own Equal Pay Act analyses. *See, e.g., Schleicher v. Preferred Sols., Inc.*, 831 F.3d 746, 752–53 (6th Cir. 2016) ("We have read the EPA to establish a three-step burden-shifting scheme . . . . *Finally*, if an EPA defendant proves an affirmative defense, an EPA plaintiff 'must come forward with evidence demonstrating the existence of a triable issue of fact' regarding pretext.")

(citations omitted); *Irby*, 44 F.3d at 954 ("When the defendant overcomes the burden, the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential.") (citations omitted); *Covington v. S. Ill. Univ.*, 816 F.2d 317, 322 (7th Cir. 1987) ("Although we realize that a plaintiff need not establish discriminatory intent . . . we do not believe that the Act precludes an employer from carrying out a policy which . . . has in no way been shown to undermine the goals of the EPA."); *but see Rizo*, 950 F.3d at 1223 ("EPA claims have just two steps: (1) the plaintiff bears the burden to establish a prima facie showing of a sex-based wage differential; (2) if the plaintiff is successful, the burden shifts to the employer to show an affirmative defense. No showing of pretext is required.").

### 3. Federal Hiring and Pay Authority

Of particular relevance in the instant matter, Congress has statutorily prescribed the circumstances under which most federal employees' initial salary may be set above the minimum step of the appropriate grade under the GS system. First enacted in 1966, 5 U.S.C. § 5333 provides in relevant part:

> New appointments shall be made at the minimum rate of the appropriate grade. However, under regulations prescribed by the Office of Personnel Management which provide for such considerations as the existing pay or unusually high or unique qualifications of the candidate, or a special need of the Government for his services, the head of an agency may appoint, with the approval of the Office in each specific case, an individual to a position at such a rate above the minimum rate of the appropriate grade as the Office may authorize for this purpose.

5 U.S.C.A. § 5333. In other words, new government employees are presumed to start at the minimum salary step (or rate) unless "the existing pay or unusually high or unique qualifications of the candidate, or a special need of the Government" justifies an upward departure. These pay rate decisions are further governed by OPM regulations outlining agencies' "Superior qualifications and special needs pay-setting authority," which state:

(a) Agency authority.

(1) An agency may use the superior qualifications or special needs pay-setting authority in 5 U.S.C. 5333 to set the payable rate of basic pay for an employee above the minimum rate of the highest applicable rate range for the employee's position of record. . . .

(b) Superior qualifications or special needs determination.  An agency may set the payable rate of basic pay of a newly appointed employee above the minimum rate of the grade under this section if the candidate meets one of the following criteria:

     (1) The candidate has superior qualifications.  An agency may determine that a candidate has superior qualifications based on the level, type, or quality of the candidate's skills or competencies demonstrated or obtained through experience and/or education, the quality of the candidate's accomplishments compared to others in the field, or other factors that support a superior qualifications determination.  The candidate's skills, competencies, experience, education, and/or accomplishments must be relevant to the requirements of the position to be filled.  These qualities must be significantly higher than that needed to be minimally required for the position and/or be of a more specialized quality compared to other candidates . . . .

(c) Pay rate determination.  An agency may consider one or more of the following factors, as applicable in the case at hand, to determine the step at which to set an employee's payable rate of basic pay using the superior qualifications and special needs pay-setting authority:

     (1) The level, type, or quality of the candidate's skills or competencies;

     (2) The candidate's existing salary, recent salary history, or salary documented in a competing job offer (taking into account the location where the salary was or would be earned and comparing the salary to payable rates of basic pay in the same location) . . . .

5 C.F.R. § 531.212.

Case law on this statutory and regulatory authority is sparse at best.  The Court has identified only one case in which these provisions have been clearly addressed in conjunction with the EPA.  Reviewing a claim brought by an employee of the U.S. Department of Education, another judge of this Court noted "that 'existing pay' is enshrined both in section 5333 and 5 C.F.R. § 531.212(c) as a valid factor in setting the starting pay of federal employees."  *North v. United States*, 123 Fed. Cl. 457, 466 (2015).

**B.  Analysis**

As noted above, despite the Federal Circuit's decision in *Yant v. United States*, 588 F.3d 1369 (Fed. Cir. 2009), the government concedes that Plaintiff has established a prima facie case under the EPA.  Gov.'s Resp. at 2 ("As an initial matter, in our answer, we agreed that [Plaintiff]

23

established a *prima facie* case . . . .").  Accordingly, the crux of this dispute—and the focus of the cross-motions for summary judgment—comes down to whether the government has established an affirmative defense.  Because "each motion is evaluated on its own merits" with reasonable inferences "resolved against the party whose motion is being considered," the Court now addresses the respective motions in turn.  *Marriott Int'l Resorts*, 586 F.3d at 968–69 (citation omitted).

### 1.  Plaintiff's Motion for Summary Judgment

Plaintiff's motion for summary judgment boils down to two interrelated assertions, one legal and one factual.  First, Plaintiff asserts that as a matter of law an EPA defendant may not rely on prior salary *alone* as a "factor other than sex" in justifying a wage differential.  *See, e.g.*, Pl.'s Reply at 7.  Second, as to the facts, Plaintiff argues that there is no genuine dispute of material fact that the government relied on prior salary *alone* in paying Male Comparator more than Plaintiff.  Pl.'s Mot. Summ. J. at 25–26.

On the legal question, for the reasons discussed below regarding genuine issues of material fact, the Court does not need to conclusively decide whether prior salary alone is a factor other than sex in order to rule on Plaintiff's motion.  At this juncture, the Court only needs to determine, which it easily does,[12] that it is not going to follow the Ninth Circuit's decision in *Rizo*.  The legal standard in that case—that prior salary may never be used, even in combination with other factors, as a defense under the EPA—is the only legal standard under which Plaintiff could prevail on summary judgment given the material facts in dispute.  Under the standards followed in EPA cases other than *Rizo* and its progeny, Plaintiff is unable to demonstrate the absence of a genuine issue of material fact and, therefore, is not entitled to summary judgment on her claims.

---

[12] The opening paragraph of Judge McKeown's concurrence in *Rizo*, succinctly describes the problems with the reasoning of the majority *en banc* decision:

> The majority embraces a rule not adopted by any other circuit—prior salary may never be used, even in combination with other factors, as a defense under the Equal Pay Act.  The circuits that have considered this important issue have either outright rejected the majority's approach or declined to adopt it.  I see no reason to deepen the circuit split. What's more, the majority's position is at odds with the view of the Equal Employment Opportunity Commission ("EEOC"), the agency charged with administering the Act. And, perhaps most troubling, the majority fails to account for the realities of today's dynamic workforce, choosing instead to view the workplace in a vacuum.  In doing so, it betrays the promise of equal pay for equal work and disadvantages workers regardless of gender identity.

950 F.3d at 1232 (McKeown, J. concurring).

The Court begins with Plaintiff's assertion that "Defendant's *decisionmaker* has provided undisputed testimony that she relied on nothing other than prior salary . . . ." Pl.'s Mot. Summ. J. at 23–24 (emphasis added). The "decisionmaker," in Plaintiff's estimation, is Sfakianos, who, according to Plaintiff, "set the rates of pay for Plaintiff and [Male Comparator]." *Id*. at 24. Plaintiff focuses on Sfakianos' testimony as part of the VA's EEO investigation that "[e]ach Pharmacist there was boarded based on their current salary," Appx 199, and that she "boarded everybody exactly the same without regards to anything special other than their current pay stubs," Appx 201. Plaintiff also cites "the contents of" Sfakianos' recommendation letters to the Board as undisputed evidence "that Plaintiff was the more experienced hire; yet, Sfakianos recommended that [Male Comparator] be hired at Step 10 and Plaintiff at Step 7 . . . ." Pl.'s Mot. Summ. J. at 26. Thus, according to Plaintiff, "no reasonable [factfinder] could find that Defendant based the decision to pay [Male Comparator] more on 'prior pay and more experience'" and "judgment should be granted for the Plaintiff." *Id*. Respectfully, the Court disagrees.

Even if the Court were to adopt Plaintiff's conclusions from Sfakianos' *testimony*, which was taken three-and-a-half years after Plaintiff's boarding, that is not the end of the matter— especially when one views the rest of the record in the light most favorable to the government as the non-moving party. For example, just prior to Plaintiff's official hiring, Sfakianos informed Plaintiff that "[t]hey do not base [salary] on years of experience. It is more based on *education, residency, published articles, BCPS, etc...* but they do *consider* salary matching." Appx 71 (emphasis added). This communication alone, sent by email during the boarding process, suggests a multi-layered salary justification. Moreover, the Board's recommendation cites Plaintiff's "pharmaceutical skills, education *and* current salary" in justifying the step on the salary scale she was given. Appx 69 (emphasis added). Is a reasonable factfinder to ignore this more contemporaneous evidence?

Even if, for the sake of argument, the Court were to grant that the record could arguably support a conclusion that Sfakianos relied on prior salary alone, the record—viewed in the light most favorable to the non-movant—could equally support a conclusion that Sfakianos was *not* the "decisionmaker." Thus, a reasonable factfinder could find Sfakianos' alleged reasoning immaterial. Per the VISN 7 Board's policy, the "Representative will then forward the request and file to the Chair of the [relevant Board], who will . . . convene the necessary members to act on the request." Appx 307. Then, "[t]he *Board's* recommendation . . . will be returned to the originating HR Office *for final approval by the Medical Center Director*." *Id*. (emphasis added). Moreover, Kendra Brookshire, who served as the chairman of the Board for Plaintiff and Male Comparator, even testified that the Board "mak[es] a recommendation but *still, it's not the final say*." Appx 221 (emphasis added). So, whose recommendation and decision controls? And, thus, whose alleged justifications are material? Viewing the record in the light most favorable to the non-movant, it is the Board's recommendations and the Medical Director's decisions with

respect to the salaries of Plaintiff and Male Comparator that are material.  While Plaintiff may be able to disprove this at trial, any conclusion to the contrary would require a weighing of facts, which is inappropriate for summary judgment.

Plaintiff also seemingly wants the Court to take judicial notice of the fact that she "was the more experienced hire . . . ."  Pl.'s Mot. Summ. J. at 26; *see also id*. at 25 ("Plaintiff undisputedly had six more years of pharmacy experience than [Male Comparator].").  Plaintiff's argument thus follows that prior salary must be the *only* factor accounting for the pay differential.  The Court does not dispute that Plaintiff received her doctorate in pharmacy years before Male Comparator.  But what constitutes "experience" is necessarily a factual inquiry.  As the government posits, Plaintiff "did not have [Male Comparator's] level of pharmacy management experience, nor his other advanced degrees . . . ."  Gov.'s Resp. at 6.  During the VA's EEO investigation, Brookshire also recalled that Male Comparator had "additional education . . . ."  Appx 223.  Moreover, the Board's recommendation for Male Comparator specifically cites how his "experience will be valuable in treating veterans in the Huntsville CBOC as a new expanded clinic where a hybrid model will be utilized between dispensing functions and direct patient care."  Appx 333.  Viewing the record in the light most favorable to the government, it cannot be said with certainty that *years* of pharmaceutical experience since graduation was the *only* type of "experience" that could have distinguished Plaintiff and Male Comparator for pay rate purposes.  Rather, this question is, again, one that would be suited for trial.

Plaintiff's motion for summary judgment rests entirely on a record that she did not further develop for purposes of her motion.  Plaintiff conducted no additional discovery (beyond initial interrogatories confirming the roles of individuals referenced in the VA's EEO Investigative Report), secured no depositions, and instead relies only on materials compiled for the Investigative Report as the indisputable proof of the government's reliance on prior salary alone.  Yet, that very record, as discussed above, leaves a reasonable factfinder with inconclusive results and genuine issues of material fact.

To be clear, Plaintiff could very well establish at trial that the government relied on prior salary *alone* in justifying the pay differential.  But that is not the procedural posture of this case.  Viewing the record in the light most favorable to the non-moving party, a reasonable factfinder could conclude that other factors were considered and incorporated into the pay differential.  Accordingly, Plaintiff has not met her burden of showing that there are no material facts in dispute; therefore, summary judgment in favor of Plaintiff is denied.

## 2.   The Government's Motion for Summary Judgment

Turning to the government's motion, the Court begins by reiterating the undeniable presence of a triable fact: whether existing or prior pay alone accounts for the pay differential between Plaintiff and Male Comparator.  Above, the Court determined that a reasonable factfinder, examining the record in the light most favorable to the government, could conclude that existing or prior pay *plus* experience (and, perhaps, other factors) were used to set Plaintiff's and Male Comparator's respective salaries and justify the differential.  But conversely, as to the government's motion for summary judgment, a reasonable factfinder viewing the facts in the light most favorable to Plaintiff could conclude that existing or prior pay *alone* explains the salary differential.  Simply put, the parties draw markedly different, but reasonable, conclusions from the same factual record.  *Compare* Pl.'s Mot. Summ. J. at 26 (describing Sfakianos' recommendation letters as undisputedly based on prior salary alone, which "[t]he Board and the approving authority then rubber-stamped") *with* Gov.'s Mot. Summ. J. at 31 (citing Sfakianos' recommendation letter of Plaintiff for the proposition that "experience had been noted in her boarding action").

Moreover, neither party offered additional evidence to support or rebut their conclusions nor conducted further discovery to aid the inquiry.  This disagreement between the parties regarding whether pay alone or pay plus other factors resulted in the salary differential between Plaintiff and Male Comparator would necessitate a finding of fact, with the Court weighing the reliability of witness testimony and documentary evidence.  However, because a judge "is not himself to weigh the evidence and determine the truth of the matter" at the summary judgment stage, *Anderson*, 477 U.S. at 249, the Court cannot grant summary judgment to either party on this factual question.

This is not the end of the inquiry, though, on the government's motion for summary judgment, as the Court must further determine whether the above factual dispute is one that "might affect the outcome of the suit under the governing law . . . ."  *Anderson*, 477 U.S. at 248.  As to the government's motion, the statutory and regulatory scheme surrounding the determining of federal government employee pay rates, as well as an undisputed admission by Plaintiff regarding factors that affected her salary at her previous employer, answer this question in the negative.  This is because, although the Court cannot conclude on the cross-motions for summary judgment whether the VA determined the pay rates for Plaintiff and Male Comparator based on existing or prior pay alone, Plaintiff has only alleged such rates were determined based on existing or prior pay alone.  And, for the reasons discussed below, in the context of setting federal employee pay, this method qualifies as a factor other than sex under the EPA.

As was discussed above, Plaintiff urges this Court to adopt the reasoning of either the Ninth Circuit (that prior salary may never be used, even in combination with other factors, as an affirmative defense under the EPA) or of the Eighth, Tenth, and Eleventh Circuits (that prior salary may only qualify as an affirmative defense to an EPA claim if it was considered in

combination with other factors) to determine in this case whether the government's alleged use of existing or prior pay alone qualifies as a factor other than sex. In the cases Plaintiff advocates that the Court follow, the circuits determined that Congress did not intend prior pay to be a factor other than sex because setting salary based on prior pay may tend to perpetuate the gender-based pay gap that Congress otherwise intended to eliminate in passing the EPA. Based on this reasoning, those circuits concluded that Congress could not have intended prior pay alone to be a factor other than sex.

However, those circuits were addressing whether Congress intended prior pay to be a factor other than sex in the context of non-federal employees. They were not examining what may or may not constitute a factor other than sex in the context of statutory and regulatory hiring provisions related to federal employees, which, as explained below, explicitly allow for the use of existing or prior salary alone in determining pay rates. In addition, the facts of the cases before those circuits do not appear to have any overlap with an undisputed admission made by Plaintiff that explains why her prior salary was lower than would be typical for a pharmacist of her experience. Taken together or separately, the federal statutory and regulatory scheme and Plaintiff's admission regarding her prior salary demonstrate why, in this case, existing or prior pay *alone* qualifies as an affirmative defense under the EPA.

The Court begins with 5 U.S.C. § 5333, which provides the reasons for which an agency may depart from the minimum rate of pay for the appropriate grade for a federal government employee appointed under the GS system. Under the statute, "[n]ew appointments shall be made at the minimum rate of the appropriate grade" unless "the *existing pay or* unusually high or unique qualifications of the candidate" justify appointing "an individual to a position at such a rate above the minimum rate of the appropriate grade . . . ." 5 U.S.C. § 5333 (emphasis added).

It is black letter law that statutory construction begins with the language of the statute itself. *VE Holding Corp. v. Johnson Gas Appliance Co*., 917 F.2d 1574, 1579 (Fed. Cir. 1990). "If the language is clear, the plain meaning of the statute will be regarded as conclusive." *Van Wersch v. Dep't of Health and Hum. Servs.*, 197 F.3d 1144, 1148 (Fed. Cir. 1999) (citation omitted). Turning to the text of § 5333, the Court takes particular note of the use of "or" in the statutory language. After all, "the plain meaning of 'or' is disjunctive," because "in the English language, the word 'or' unambiguously signifies alternatives." *Id*. at 1148, 1151; *see also In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996) (noting that "a statute written in the disjunctive is generally construed as 'setting out separate and distinct alternatives'") (citation omitted); *United States v. Moore*, 613 F.2d 1029, 1039 (D.C. Cir. 1979) ("Normally, of course, 'or' is to be accepted for its disjunctive connotation, and not as a word interchangeable with 'and.'") (footnote omitted). Therefore, § 5333, read literally, states that a new employee may be appointed above the minimum rate of the appropriate grade based on either "existing pay" *or*

"unusually high or unique qualifications" (or other factors established by OPM through regulation).

Moreover, "Congress is presumed to have intended a disjunctive meaning by using the disjunctive word 'or' . . . ." *Markovich v. Sec'y of Health and Hum. Servs.*, 477 F.3d 1353, 1357 (Fed. Cir. 2007). And "[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise . . . ." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (citation omitted). In other words, "[t]he ordinary rule is that unless a strict grammatical construction frustrates legislative intent, the term 'or' is given a disjunctive interpretation." *Ruben by Ruben v. Sec'y of Dep't of Health & Hum. Servs.*, 22 Cl. Ct. 264, 266 (1991) (citing cases). There is nothing about the grammatical construction of § 5333 that suggests anything other than that the ordinary and usual disjunctive meaning of "or" was intended, nor would use of the disjunctive meaning of "or" result in an unreasonable interpretation of the statute. The provision simply contains a disjunctive list of reasons that permit an agency to depart from the minimum pay rate for a new appointment. Indeed, the list itself is non-exhaustive, with OPM permitted to add additional reasons for a departure. If the items on the list were intended to be joined by a conjunctive, a non-exhaustive list would make little sense. Accordingly, it appears clear that the use of "or" in § 5333 was intended to have its ordinary disjunctive meaning and thus, according to Congress, existing pay *alone*, without regard to high or unique qualifications or other factors, is an appropriate reason to depart from the otherwise minimum rate of pay under the GS system.

Because it is clear that existing or prior pay alone may be used under § 5333 to determine pay rates for new GS employees, the next question becomes: how does § 5333 relate to the EPA? Congress enacted § 5333 in 1966, just three years after its passage of the EPA. *See* Pub. L. 89-554, 80 Stat. 467 (1966). Although Congress did not formally extend the FLSA (and thus the EPA) to cover most federal employees until 1974, one would be hard-pressed to argue that in the immediate wake of its passage of the EPA, Congress, via § 5333, enshrined in the primary federal pay statute a policy that would be facially discriminatory under the EPA if it had applied to federal employees at that time. But more importantly, after Congress's extension of the EPA to cover most federal employees in 1974—including GS employees, who are covered by § 5333—one would have to find that the EPA and the language regarding existing pay in § 5333 are in conflict with one another to hold that the EPA prohibits the use of existing pay alone in determining GS employee wages. The Court, however, does not read the two statutes to be in conflict. Rather, the two statutes are easily harmonized.

As was discussed above, the Court presumes Congress meant what it said in permitting federal GS pay rate determinations based on a candidate's "existing pay *or* unusually high or unique qualifications": under the GS system, existing or prior pay *alone* may be used in determining pay above the minimum rate of the appropriate grade. *See, e.g., Conn. Nat. Bank v.*

*Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citing cases).  The cases that Plaintiff suggests the Court follow, however, hold that the EPA prohibits the use of existing or prior pay alone in determining wages.  That caselaw relates to the determination of wages by non-federal government employers.  The Court here, though, is presented with a question of federal wage setting and a statute that would conflict with the interpretation of the EPA set forth in the caselaw Plaintiff cites.  In other words, in order to follow the cases regarding existing or prior pay Plaintiff prefers, the Court would have to find that the EPA and § 5333 conflict with one another and that the EPA prevails.  But, as a matter of statutory interpretation, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [a] Court is not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'"  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  In this case, giving effect to both provisions is relatively easy and comports with the precedent in at least two circuits.  *See Wernsing v. Dep't of Hum. Servs., State of Ill.*, 427 F.3d 466, 468 (7th Cir. 2005); *Spencer v. Va. State Univ.*, 919 F.3d 199, 206 (4th Cir. 2019).  Simply put, to harmonize the EPA and § 5333, all the Court must do is find that existing or prior pay alone qualifies as a factor other than sex under the EPA.  To find otherwise would not only assume Congress essentially acted contrary to the EPA's intent three years after its passage but would also require the Court to read the two statutes as conflicting with one another.

There is no reasonable way that one can read the EPA to prohibit the use of existing pay alone in determining federal employee pay *and* read § 5333 in a manner that gives effect to its allowance of the use of existing pay alone in determining initial pay for GS employees.  In other words, if existing pay alone is not a factor other than sex for GS employees, then the EPA and § 5333 necessarily conflicted with one another once the 1974 FLSA amendments were enacted and have continued to conflict in the over 45 years since.  Finding such a conflict is unnecessary, however, as the more natural reading, and the one that harmonizes the two statutes, is to conclude that existing pay alone—at least for purposes of the federal pay system—is a factor other than sex.[13]  *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984) ("[W]here two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.") (internal quotations omitted); *Watt v. Alaska*, 451 U.S. 259, 267 (1981) ("We must read the statutes to give effect to each if we can do so while preserving their sense and purpose.") (citations omitted).

---

[13] To be clear, the Court does not suggest that other courts have incorrectly construed the EPA as precluding defendants' reliance on existing or prior pay alone to justify pay differentials between employees of different sexes.  It simply notes that federal employees and the impact of § 5333 were not at issue in those cases.

Moreover, finding a conflict between the EPA and § 5333, and thus an implicit repeal of the existing pay language in § 5333, is not only unnecessary, but it is not permitted unless the "legislative intent to repeal [is] manifest in the 'positive repugnancy between the provisions' of the two statutes." *California v. United States*, 271 F.3d 1377, 1382 (Fed. Cir. 2001) (quoting *United States v. Batchelder*, 442 U.S. 114, 122 (1979) and *United States v. Borden Co*., 308 U.S. 188, 199 (1939)).  This is because "[i]t is, of course, a cardinal principle of statutory construction that repeals by implication are not favored," *Randall v. Loftsgaarden*, 478 U.S. 647, 661 (1986) (quotation omitted), and that "'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute," *Epic Sys. Corp.*, 138 S. Ct. at 1624 (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988)).  Therefore, the Court simply cannot conclude that enactment of the 1974 FLSA amendments repealed the relevant language in § 5333 unless it "is irreconcilable with [the] earlier statute, or [its] enactment so comprehensively covers the subject matter of the earlier statute that it must have been intended as a substitute." *Todd v. Merit Sys. Prot. Bd*., 55 F.3d 1574, 1577 (Fed. Cir. 1995) (citing *Traynor v. Turnage*, 485 U.S. 535, 547 (1988)).  There is nothing in the 1974 FLSA amendments, or in the simplicity with which the two statutes are harmonized, that makes "Congress' intention to repeal the earlier law . . . 'clear and manifest.'"  *Id*. (quoting *Radzanower v. Touche Ross & Co*., 426 U.S. 148, 154 (1976) and *Neptune Mut. Ass'n v. United States*, 862 F.2d 1546, 1551 (Fed. Cir. 1988)).

In order to find the EPA and § 5333 in conflict, and thus that the FLSA amendments implicitly repealed the existing pay language in § 5333, the Court would have to find that: (1) when Congress enacted the EPA in 1963 it intended existing pay alone *not* to be a factor other than sex; (2) yet Congress enacted § 5333 three years later to allow the federal government to consider existing pay alone in determining pay rates for GS appointees, which at the time totaled in excess of one million appointees; (3) Congress eight years later repealed this language in § 5333 by implication; and (4) as will be discussed more fully below, Congress 28 years later enacted another statute that allows for a departure from the minimum pay rate for the grade for certain VA employees appointed under title 38 based on existing pay alone.  This course of events would seem to be a stretch at best and certainly not the "clear and manifest" intent required to implicitly repeal § 5333 (especially considering that a natural reading of the two statutes allows the existing pay provision in § 5333 to stand as a factor other than sex).[14]

_____

[14] It would also mean that *if* existing or prior pay alone is *not* a factor other than sex, every time over the last 45 years that a federal agency hired an employee at a pay rate over the minimum rate for the pay grade for his or her position based on existing or prior salary alone, as permitted by § 5333 and 5 C.F.R. § 531.212, it was a potential EPA violation (if another employee of a different gender was performing equal work on a job the performance of which requires equal skill, effort, and responsibility, and which is performed under similar working conditions and was paid at either the minimum rate or any other comparatively lower pay rate for the position).  With millions of GS employees over this timeframe, the potential EPA violations are myriad if the relevant language in § 5333 and 5 C.F.R. § 531.212 conflicts with the EPA.

In addition, Congress has on several occasions amended and even expanded the coverage of § 5333 since the enactment of the 1974 FLSA amendments.  For instance, in 1990, Congress eliminated the GS-11 threshold for new employees to be paid above the minimum rate for their grade pursuant to § 5333.  Federal Employees Pay Comparability Act of 1990, Pub. L. No. 101-509, title V, § 529 [title I, § 106, title II, § 211(b)(1)], 104 Stat. 1427, 1449, 1461 (1990).  Such an expansion belies any congressional intent to implicitly repeal § 5333 through the enactment of the 1974 FLSA amendments.

The regulation promulgated by OPM to carry out § 5333 further confirms that "existing salary" or "recent salary history" *alone* may be used in determining GS employee's initial pay rate.  It provides that "[a]n agency may set the payable rate of basic pay of a newly appointed employee above the minimum rate of the grade . . . if the candidate meets one of" two listed criteria.  5 C.F.R. § 531.212(b).  Relevant here is the first criterion regarding "superior qualifications," which an agency determines by reviewing "the level, type, or quality of the candidate's skills or competencies demonstrated or obtained through experience and/or education, the quality of the candidate's accomplishments compared to others in the field, or other factors that support a superior qualifications determination."  5 C.F.R. § 531.212(b)(1).  Additionally, "[t]he candidate's skills, competencies, experience, education, and/or accomplishments must be relevant to the requirements of the position to be filled" and "[t]hese qualities must be significantly higher than that needed to be minimally required for the position and/or be of a more specialized quality compared to other candidates . . . ."  *Id.*  If a determination is made that this criterion is met, the "agency may consider *one or more* of" a list of factors, including "[t]he candidate's *existing salary, recent salary history*, or salary documented in a competing job offer," to determine the step of an employee's initial pay rate.  5 C.F.R. § 531.212(c)(1)–(2) (emphasis added).

Plaintiff, in opposing the government's motion, asserts that subsection (b) allows an agency to "set the basic pay of a newly appointed employee above the minimum rate <u>only</u> if it first determines that the candidate has 'superior qualifications' which 'must be significantly higher than that needed to be minimally required for the position and/or be of a more specialized quality <u>compared to other candidates</u>.'"  Pl.'s Resp. at 17 (emphasis in original).  The Court agrees.  From this, however, Plaintiff concludes that "Defendant made no finding that [Male Comparator's] qualifications were significantly higher *compared to Plaintiff's* qualifications; accordingly, the regulatory language does not authorize reliance on prior salary here."  *Id.* (emphasis added).  The Court disagrees.

First, under Plaintiff's conflation of the language, an agency would *always* need to assess candidates against each other, even though the disjunctive "or" in the regulation permits a "superior qualifications" determination solely based on a candidate possessing qualities "significantly higher than that needed to be minimally required for the position . . . ."  5 C.F.R. § 531.212(b)(1).  Second, engendering even more illogical results, Plaintiff's interpretation

32

would presumably require the VA—and all federal agencies, for that matter—to compare a *candidate's* qualifications with effectively *all other current* employees doing the same or similar work.  According to Plaintiff, unless that candidate's qualifications were "significantly higher" than all such employees, the candidate would not be eligible for a subsection (c) pay rate determination above the minimum step of the grade.  The regulation, however, speaks only of "a candidate" and "other candidates," not "other employees."  In short, Plaintiff's interpretation is not a fair reading of the regulation.  Moreover, Plaintiff herself was found to have superior qualifications and was therefore paid above the minimum pay rate for the grade, just as the regulation envisions.

In addition, the VA Handbook,[15] consistent with both § 5333 and the OPM regulation, expressly permits the use of a "candidate's *existing pay* or *recent salary history*, competing job offer(s), higher or unique qualifications, *or* special needs of VA" in setting initial pay rates.  VA Handbook 5007/51, Part II, Chapter 3, Subpart 3(b)(1) (emphasis added).  Thus, the disjunctive "or" in the VA Handbook specifically permits use of existing pay or recent salary history *alone* without consideration of other factors in determining a VA employee's pay rate.

Furthermore, another statute applicable to the VA, enacted in 1991, authorizes the use of existing pay alone in determining an employee's salary: "[t]he Secretary, after considering an individual's *existing pay*, higher or unique qualifications, *or* the special needs of the Department, may appoint the individual . . . at a rate of pay above the minimum rate of the appropriate grade." 38 U.S.C. § 7408 (emphasis added).  Although this provision does not directly apply to the appointment of VA pharmacists, the principle is nonetheless the same: Congress has statutorily allowed pay to be determined through consideration of existing pay *alone* even after passage of the EPA.  And, as with 5 U.S.C. § 5333, the only way to harmonize 38 U.S.C. § 7408 and the EPA, while giving effect to all the language in both statutory provisions, is to interpret existing pay alone to be a factor other than sex.

Although 5 U.S.C. § 5333 and 38 U.S.C. § 7408 are not dispositive of Plaintiff's claim, as she was not appointed under either statute, they are conclusive evidence that, at least for federal employees, Congress considers existing or prior pay alone to be a factor other than sex.

---

[15] The Federal Circuit has recognized that the VA "has not issued a comprehensive set of regulations implementing the VHA personnel provisions in title 38.  Instead, DVA has set forth its interpretation of the title 38 personnel provisions in the form of manuals, directives, and handbooks . . . ." *James v. Von Zemensky*, 284 F.3d 1310, 1318-19 (Fed. Cir. 2002).  The circuit has explained that such documents are "akin to 'interpretations contained in policy statements, agency manuals, and enforcement guidelines," and, as such, "are not entitled to *Chevron* deference."  *Id*. at 1319 (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000)).  Rather, "they are accorded a lesser degree of deference 'proportional to [their] power to persuade.'"  *Id*. (quoting *United States v. Mead Corp*., 533 U.S. 218, 234 (2001)); *see also Martin v. Occupational Safety and Health Rev. Comm'n*, 499 U.S. 144, 157 (1991) (holding that "some weight" is due to informal interpretations though not "the same deference as norms that derive from the exercise of . . . delegated lawmaking powers").

OPM's own regulations confirm this decision.[16]  Thus, absent any indication of pretext,[17] the government's use of existing or prior pay alone in determining an employee's salary as part of the GS or similar system, like that used by the VA for pharmacists and other "hybrid" employees,[18] is an affirmative defense to an EPA claim.  To hold otherwise would read at least two statutes (both applicable to some employees at the VA), an OPM regulation (applicable to some employees at the VA), and the VA Handbook off the books.  Unless and until Congress so instructs, this Court declines to "substitute [its] judgment for the judgment of the employer," when the factor chosen is "gender-neutral on its face and *bona fide* – that is, used in good faith and not in a discriminatory manner – in its application."  *Behm*, 68 Fed. Cl. at 400.  The Court simply cannot read two federal statutes (both enacted after the EPA) to conflict with the EPA when a more natural reading harmonizes them.  Moreover, it simply cannot be the case that the VA would have an affirmative defense to an EPA claim based on use of existing or prior pay alone for employees it appointed under title 5 or 38 U.S.C. § 7408, but not for employees, like Plaintiff, appointed under another provision in title 38.  This would essentially carve VA employees into distinct classes for the purpose of EPA claims.

What is more, even if these two federal statutes, and the OPM and VA regulatory schemes implementing those statutes, did not demonstrate that for federal employees, absent a showing of pretext, use of existing or prior pay alone qualifies as a factor other than sex, the Court would need to ignore an undisputed admission of fact by Plaintiff in order to find that the VA violated the EPA in this case.  This is because the undisputed facts of this case demonstrate why Plaintiff's prior salary was set at the level it was: Plaintiff explained that her North Alabama Regional Hospital employment "had a lower salary . . . because there were a lot of benefits and perks that no one else offers in Pharmacy."  Appx 176.[19]  For example, Plaintiff "could get off work any time [she] wanted to," "accrued like three days of comp time every month," and "was

---

[16] Indeed, a recent Executive Order supports this interpretation, at least under the law when Plaintiff was hired.  That Executive Order announced that OPM "anticipates issuing a proposed rule that will address the use of salary history in the hiring and pay-setting processes for Federal employees . . . ."  Exec. Order No. 14,069, 87 Fed. Reg. 15,315 (published Mar. 18, 2022).

[17] Plaintiff fails to offer any evidence whatsoever that the government's justification is pretextual.  Rather, she insists the government "has failed to meet its burden of establishing its affirmative defense" and thus "the Court should not reach the pretext stage of the burden-shifting analysis."  Pl.'s Resp. at 26-27.  The Court, of course, has found otherwise.  Plaintiff bears the burden of production to demonstrate pretext, yet Plaintiff offers no evidence to support a finding of pretext here.  Left with nothing but Plaintiff's successive rejections of the government's stated defense, the Court's hands are tied, and the affirmative defense carries the day.

[18] The pay schedule that covers VA pharmacists has the same general structure as OPM's GS pay scale.  Plaintiff and Male Comparator were paid at the GS-12 grade for their respective pay rates on the VA's "Special Rates" scale.

[19] Ordinarily, a concession like this under Federal Circuit precedent would be fatal to Plaintiff's prima facie case under the EPA.  However, in this case, the government conceded that Plaintiff had established a prima facie case of an EPA violation.  *See supra* note 1.

able to spend – do things with [her] family a lot easier than [she could] at and [sic] other job." *Id*.

Thus, while using prior salary in determining a new appointee's starting salary "may serve to perpetuate an employee's wage level that has been depressed because of sex discrimination by a previous employer," *Covington*, 816 F.2d at 322, the Court knows in this case, directly from Plaintiff, that her prior salary was "depressed" at her previous employer "because there were a lot of benefits and perks that no one else offers in Pharmacy," Appx 176. In other words, basing a pay rate on a prior salary *could* perpetuate past discrimination if gender discrimination led to that lower prior salary, but Plaintiff has not made, much less offered any evidence to support, such a claim. And the undisputed fact the Court has before it on this point is an admission by Plaintiff that her prior salary was lower because of "benefits and perks," not gender discrimination.

Facially, the text of the EPA does not suggest any limitations to the broad, "factor other than sex" catch-all affirmative defense. Given this facially broad catch-all exception, Congress's explicit grant of authority to federal agencies to use existing pay alone in determining federal employees' salaries in at least two statutes, and Plaintiff's admission that her lower prior salary was the result of benefits and perks (and not discrimination), the Court simply cannot rule in the instant case that the VA violated the EPA (even assuming that the VA used existing salary alone to set Male Comparator's pay rate higher than Plaintiff's). *See, e.g.*, *Yant*, 588 F.3d at 1374 ("This case, however, is completely devoid of the historical discrimination at issue in *Corning Glass Works*, and the record before us does not suggest that the TVHS is hiring female PAs to avoid liability under the Equal Pay Act. An Equal Pay Act violation is established when an employee demonstrates past or present discrimination based on sex. There has been no such showing here."); *Wernsing*, 427 F.3d at 470 ("Wage patterns in some lines of work could be discriminatory, but this is something to be proved rather than assumed. Wernsing has not offered expert evidence (or even a citation to the literature of labor economics) to support a contention that the establishments from which the Department recruits its employees use wage scales that violate the Equal Pay Act and thus discriminate against women. If sex discrimination led to lower wages in the 'feeder' jobs, then using those wages as the base for pay at the Department would indeed perpetuate discrimination and violate the Equal Pay Act. But as the record is silent about this possibility, and plaintiffs bear the burden of persuasion in civil litigation, the Department is entitled to the summary judgment it received.") (internal citations omitted).

In sum, Plaintiff alleges the VA appointed Male Comparator at a higher pay rate based on his existing pay alone. Although the Court is unable to determine at this stage whether existing pay alone, or in conjunction with other factors, formed the basis for the pay differential between Plaintiff and Male Comparator, the Court can conclude that Congress granted agencies the

authority to depart upwardly from the minimum rate of pay for new federal employees hired under title 5, including some VA employees, and certain other VA employees under title 38, based on existing or prior pay alone. Subsequent regulations further reinforce this authority. The Court can also conclude, based on the undisputed facts, that Plaintiff's prior pay was lower because Plaintiff's previous employer, by Plaintiff's own admission, offered "a lot of benefits and perks that no one else offers in Pharmacy." Accordingly, any factual dispute over whether the agency used existing or prior pay alone *or* existing- or prior-pay-plus is immaterial to the "outcome of the suit," *Anderson*, 477 U.S. at 248, and cannot be the basis for a genuine dispute of fact that warrants trial. The government, therefore, "is entitled to judgment as a matter of law." RCFC 56(a).

## CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has failed to establish the absence of a genuine issue of fact as to those facts material to her motion for summary judgment. Accordingly, Plaintiff's motion for summary judgment is **DENIED**.

Furthermore, the Court concludes that Congress permitted the VA to use existing or prior pay alone in determining pay rates for new appointees. Thus, as to the government's motion for summary judgment, any factual question of whether existing or prior pay alone was used in determining Plaintiff's and Male Comparator's pay rates is immaterial to the outcome of this case, and the government is entitled to judgment as a matter of law. Therefore, the government's motion for summary judgment is **GRANTED**. The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

<u>s/ Zachary N. Somers</u>
ZACHARY N. SOMERS
Judge